UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION
_____

BRIAN P. LANE, Individually and,
on behalf of all others similarly situated

     Plaintiff,

v.

THE UNITED STATES

     Defendant.

Case No. 3:19-cv-01492-S

## **DEFENDANT'S MOTION TO DISMISS AND BRIEF IN SUPPORT**

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. TYLER
Assistant Branch Director

MATTHEW J. GLOVER
Counsel to the Assistant Attorney General

ERIC J. SOSKIN (PA Bar #200663)
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Rm. 12002
1100 L Street, NW
Washington, D.C. 20530
Telephone: (202) 353-0533
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

ERIN NEALY COX
United States Attorney

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, TX 75242-1699
Telephone: (214) 659-8626
Fax: (214) 659-8807
Email: brian.stoltz@usdoj.gov

*Attorneys for Defendant*

# TABLE OF CONTENTS

I.   Introduction .................................................................................................. 1

II.  Background..................................................................................................... 2

    A.   Machine Guns Are Prohibited Contraband, The Ownership Of
        Which Has Long Been Restricted By Statute. ................................................ 2

    B.   Some Bump Stocks Have Previously Been Treated As Prohibited
        Machine Guns, While Others Have Been Treated As Unregulated
        Firearms Parts.................................................................................................. 5

    C.   The Final Rule Clarified That Bump Stocks Fall Within The
        Statutory Definition of Machine Gun.............................................................. 7

    D.   Other Litigation Arising From The Federal Ban On Bump Stocks. ............ 8

    E.   The Instant Action. ...................................................................................... 10

III. Arguments And Authorities In Support ................................................... 11

    A.   Legal Standard For A Motion To Dismiss Under Rule 12(b)(6). .............. 11

    B.   The Prohibition On Bump Stock Possession Is An Exercise Of The
        Police Power That Does Not Give Rise To A Compensable Taking.......... 12

    C.   The Ban on Bump Stocks Does Not Constitute A *Per Se*
        Taking For Which Compensation Is Required Under
        *Horne v. Dep't of Agriculture*. ................................................................... 18

    D.   Under The Regulatory Takings Principles Supplied By
        *Penn Central*, No Compensable Regulatory Taking Has Occurred. .......... 21

IV.  Conclusion................................................................................................... 25

## TABLE OF AUTHORITIES

### Cases

*Acadia Tech., Inc. v. United States,*
 458 F.3d 1327 (Fed. Cir. 2006) .................................................................. 1, 13, 17, 18

*Akins v. United States,*
 82 Fed. Cl. 619 (2008) ...................................................................................... 6, 15

*Akins v. United States,*
 312 F. App'x 197 (11th Cir. 2009) .................................................................... 6, 25

*Allied-General Nuclear Services v. United States,*
 839 F.2d 1572 (Fed Cir. 1988) ............................................................................ 17

*AmeriSource Corp. v. United States,*
 525 F.3d 1149 (Fed. Cir. 2008) ........................................................................... 17

*Andrus v. Allard,*
 444 U.S. 51 (1979) ....................................................................................... 13, 14

*Aposhian v. Barr,*
 374 F. Supp. 3d 1145 (D. Utah 2019) ................................................................... 9

*Archbold-Garrett v. New Orleans City,*
 893 F.3d 318 (5th Cir. 2018) ........................................................................... 17-18

*Ashcroft v. Iqbal,*
 556 U.S. 662 (2009) .......................................................................................... 11

*Branch v. United States,*
 69 F.3d 1571 (Fed. Cir. 1995) ............................................................................ 24

*Building Owners & Managers Ass'n v. FCC,*
 254 F.3d 89 (D.C. Cir. 2001) ............................................................................... 9

*Commonwealth v. Alger,*
 61 Mass. 53 (1851) ........................................................................................... 13

*Da Vinci Inv., L.P. v. City of Arlington, Tex.,*
 747 F. App'x. 223 (5th Cir. 2018) ....................................................................... 22

*Degan v. Bd. of Trustees of Dallas Police & Fire Pension Sys.,*
 No. 17-cv-01596-N, 2018 WL 4026373 (N.D. Tex. Mar. 14, 2018) ..................... 22, 23

*Dennis Melancon, Inc. v. City of New Orleans*,
    703 F.3d 262 (5th Cir. 2012) ....................................................................... 24

*F.J. Vollmer Co., Inc. v. Higgins*,
    23 F.3d 448 (D.C. Cir. 1994) .................................................................... 3, 5

*Friedman v. City of Highland Park, Ill.*,
    784 F.3d 406 (7th Cir. 2015) ........................................................................ 2

*Gardner v. Michigan*,
    26 S. Ct. 106 (1905) .................................................................................... 20

*German Alliance Ins. Co. v. Barnes*,
    189 F. 769 (Kan. 1st Cir. 1911) ................................................................. 13

*Guedes et al. v. ATF*,
    356 F. Supp. 3d 109 (D.D.C. 2019),
    *aff'd* 920 F.3d 1 (D.C. Cir. 2019) .......................................................... 9, 10

*Gun Owners of America, Inc., et al. v. Barr, et al.*,
    363 F. Supp. 3d 823 (W.D. Mich. 2019) ..................................................... 9

*Gun Owners of America, Inc. et al. v. Barr, et al.*,
    No. 19-1298, 2019 WL 1395502 (6th Cir. Mar. 25, 2019); ........................ 9

*Gun South, Inc. v. Brady*,
    877 F.2d 858 (11th Cir. 1989) ................................................................... 23

*Holliday Amusement Co. of Charleston, Inc. v. South Carolina*,
    493 F.3d 404 (4th Cir. 2007) ....................................................... 16, 17, 18

*Horne v. U.S. Dep't of Agriculture*,
    135 S. Ct. 2419 (2015) .................................................... 18, 19, 20, 22

*Illinois Bell Telephone Co. v. FCC*,
    988 F.2d 1254 (D.C. Cir. 1993) ................................................................ 12

*In re Katrina Canal Breaches Litig.*,
    495 F.3d 191 (5th Cir. 2007) ..................................................................... 12

*Jim Sowell Const. Co. v. City of Coppell, Tex.*,
    No. 3:96-CV-0666-D, 2000 WL 968782 (N.D. Tex. July 12, 2000) ........... 18

*John Corp. v. City of Houston*,
    214 F.3d 573 (5th Cir. 2000) ..................................................................... 17

*Keystone Bituminous Coal Assn't v. DeBenedictis,*
   480 U.S. 470 (1987) ........................................................................... 23

*Lamont v. O'Neill,*
   285 F.3d 9 (D.C. Cir. 2002) ............................................................... 2-3

*Lingle v. Chevron, U.S.A.,*
   544 U.S. 528 (2005) ..................................................................... 22, 23

*Lucas v. S.C. Coastal Council,*
   505 U.S. 1003 (1992) ....................................................... 12, 13, 22, 25

*Maryland Shall Issue v. Hogan,*
   353 F. Supp. 3d 400 (D. Md. 2018) ............................................... 15, 18

*Miller v. Schoene,*
   276 U.S. 272 (1928) ..................................................................... 16, 17

*Mitchell Arms, Inc. v. U.S.,*
   7 F.3d 212, 216 (Fed. Cir. 1993) ................................................... 17, 24

*Mugler v. Kansas,*
   123 U.S. 623 (1887) ............................................................. 12, 15, 16

*Murr v. Wisconsin,*
   137 S. Ct. 1933 (2017) ................................................................. 12, 14

*New York Pizzeria, Inc. v. Syal,*
   56 F. Supp. 3d 875 (S.D. Tex. 2014) .................................................. 12

*Nortz v. United States,*
   294 U.S. 317 (1935) ........................................................................... 20

*One 1958 Plymouth Sedan v. Pennsylvania,*
   380 U.S. 693 (1965) ........................................................................... 14

*Osamor v. United States,*
   No. 4:09-cv-1500, 2010 WL 11668149 (S.D. Tex. Nov. 5, 2010) ............... 14

*Penn Central Transportation Co. v. City of New York,*
   438 U.S. 104 (1978) ...................................................................... 21-22

*Penn. Coal Co. v. Mahon,*
   260 U.S. 393 (1922) ............................................................. 14, 18, 22

iv

*Price v. City of Junction, Tex.*,
  711 F.2d 582 (5th Cir. 1983) ...................................................................... 12

*Queta's Investment, Inc. v. City of Hidalgo*,
  No. M-04-272, 2005 WL 2416656 (S.D. Tex. Sept. 30, 2005) ..................................... 18

*Residents Against Flooding v. Reinvestment Zone No. 17, Houston, Tex.*,
  260 F. Supp. 3d 738 (S.D. Tex. 2017) ............................................................ 18

*Roberts v. Bondi*,
  No. 8:18-cv-1062, 2018 WL 3997979 (M.D. Fla. Aug. 21, 2018) ........................ 15, 16

*Ruckelshaus v. Monsanto*,
  467 U.S. 986 (1984) ................................................................................ 9

*Sig Sauer, Inc. v. Brandon*,
  826 F.3d 598 (1st Cir. 2016) ........................................................................ 5

*Spell v. Edwards*,
  No. 12-cv-796, 2013 WL 5232341 (E.D. La. Sept. 13, 2013) ................................13-14

*Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*,
  535 U.S. 302 (2002) ................................................................................ 12

*United States v. Gilbert*,
  No. CR05-71 MJP, 2016 WL 11588376 (W.D. Wash. Feb. 26, 2016) ........................ 14

*United States v. Hager*,
  879 F.3d 550 (5th Cir. 2018) ..................................................................... 19

*United States v. Hamilton*,
  57 F. App'x. 211 (5th Cir. 2003) .............................................................. 2, 14

*United States v. Haney*,
  264 F.3d 1161 (10th Cir. 2001) ..................................................................... 4

*Wilkerson v. Whitley*,
  28 F.3d 498 (5th Cir. 1994) ...................................................................... 19

## Statutes and Other Authorities

5 U.S.C. § 701 *et seq.* ............................................................................... 9

18 U.S.C. § 921 ....................................................................................... 3

18 U.S.C. § 921(a)(23) ............................................................................... 4

18 U.S.C. § 922(o) ............................................................................... 1, 2, 14, 20

18 U.S.C. § 922(o)(1) ...................................................................................... 4

18 U.S.C. § 922(o)(2) ...................................................................................... 4

18 U.S.C. § 926(a) ........................................................................................... 5

26 U.S.C. 5845(b) ............................................................................................ 7

26 U.S.C. chap. 53 ........................................................................................... 3

26 U.S.C. § 5822 .............................................................................................. 3

26 U.S.C. § 5841(c) ......................................................................................... 3

26 U.S.C. § 5845 .............................................................................................. 2

26 U.S.C. § 5845(b) ......................................................................................... 5

26 U.S.C. § 7801(a)(2)(A) ............................................................................... 5

26 U.S.C. § 7805(a) ......................................................................................... 5

28 U.S.C. § 599A(b)(1) .................................................................................... 5

Firearm Owners Protection Act ("FOPA"), Pub. L. 99-308,
    100 Stat. 449 (1986) .................................................................................. 2

Omnibus Crime Control & Safe Streets Act, Pub. L. No. 90-351,
    82 Stat. 197 (1968) .................................................................................... 2

An Act to Regulate Commerce in Firearms, Pub. L. No. 785,
    52 Stat. 1250 (1938) .................................................................................. 2

Fed. R. Civ. P. 12(b)(6) ................................................................................. 11

28 C.F.R. § 0.130(a)(1)-(2) ............................................................................. 5

*Application of the Definition of Machinegun to "Bump Fire" Stocks and
    Other Similar Devices*, 82 Fed. Reg. 60929 (Dec. 26, 2017) ................... 7

*Definition of Machinegun*, 83 Fed. Reg. 7949 (Feb. 20, 2018) ...................... 7

*Bump-Stock-Type Devices*, 83 Fed. Reg. 13442 (Mar. 29, 2018) ................... 7

*Bump-Stock-Type Devices*, 83 Fed. Reg. 66514 (Dec. 26, 2018) ("Final Rule") ...... *passim*

H.R. Rep. No. 83-1337, § 548, *reprinted in* 1954 U.S.C.C.A.N. 4017................................3

H.R. Rep. No. 99-495, at 1, (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327 ......................4

ATF Ruling 2006-2 ...................................................................................................6

*The Firearms Owners' Protection Act: A Historical and Legal Perspective*,
    17 Cumb. L. Rev. 585 (1987) ..........................................................................4

## I.     Introduction

In December of 2018, the Department of Justice, through its component, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), issued a final rule to ensure that "bump stocks"—firearms attachments that, when employed, permit semi-automatic rifles to function as machine guns—no longer pose a danger to public safety by clarifying that these devices constitute machine guns prohibited by existing federal law, 18 U.S.C. § 922(o). *See Bump-Stock-Type Devices*, 83 Fed. Reg. 66514 (Dec. 26, 2018) ("Final Rule"). Plaintiff contends that the rule issued by ATF and the Department of Justice (collectively, "DOJ") that bump stocks would be recognized as prohibited machineguns constitutes a "compensable taking." Class Action Complaint ¶ 8, ECF No. 1 ("Compl."). Not so. A criminal prohibition on the possession of a highly dangerous, contraband weapon "is the kind of exercise of the police power that has repeatedly been treated as legitimate even in the absence of compensation to the owners." *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1332-33 (Fed. Cir. 2006). DOJ has not seized these weapons for use by the Government, the public, or other private persons, but has instead mandated their destruction. And Plaintiff cannot demonstrate "investment-backed expectations," Compl. ¶ 21, in the continued possession of these deadly machine guns free from federal regulation. Accordingly, no compensation is required for the destruction of Plaintiff's bump stocks in accordance with the statutory prohibition on these machine guns.

## II.     Background

### A.     Machine Guns Are Prohibited Contraband, The Ownership Of Which Has Long Been Restricted By Statute.

A longstanding federal criminal statute, 18 U.S.C. § 922(o), provides that it "shall be unlawful for any person to transfer or possess a machinegun,"[1] with limited exceptions for those machine guns lawfully possessed prior to the effective date of the statute and those possessed under the authority of a governmental entity.  This statute represents the culmination of a decades-long process by which Congress imposed increasingly strict regulations on machine guns: the Gun Control Act of 1968 ("GCA"), 18 U.S.C. Chapter 44; the National Firearms Act of 1934 ("NFA"), 26 U.S.C. Chapter 53; and the Firearm Owners Protection Act ("FOPA"), Pub. L. 99-308, 100 Stat. 449 (1986).  Together, these statutes have transformed the role of machine guns in American society from being "the weapon of choice among gangsters in Chicago" in the early part of the 20th century to being obvious "contraband" under federal law.  *Compare Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 416 (7th Cir. 2015) (Manion, J., dissenting) *with United States v. Hamilton*, 57 F. App'x 211 (5th Cir. 2003) (per curiam).

The NFA, the first major federal statute to regulate guns, required all persons engaged in the business of selling "firearms" (including machine guns)[2] and all firearms

---

[1] Federal statutes use the single-word spelling for "machinegun."  To improve readability, Defendants will use the ordinary spelling of "machine gun" as two words, except where directly quoting the statute or derivative interpretations.

[2] Although the NFA applies to "firearms," the term "firearms" is defined in the statute as a narrow set of dangerous weapons, not the full class of weapons labeled as "firearms" in ordinary parlance.  *See* 26 U.S.C. § 5845; *Lamont v. O'Neill*, 285 F.3d 9, 11 n.1 (D.C.

owners to register with the Collector of Internal Revenue, and subjected the manufacture

and sale of regulated firearms to a series of application and authorization requirements.[3]

*See* 26 U.S.C. chap. 53.  Congress enacted the NFA to target "lethal weapons . . . [that]

could be used readily and efficiently by criminals or gangsters."  H.R. Rep. No. 83-1337,

§ 548, *reprinted in* 1954 U.S.C.C.A.N. 4017, 4542.

In 1968, Congress passed the GCA, intended to "regulate more effectively

interstate commerce in firearms" to reduce crime and misuse, "assist the States and their

political subdivisions to enforce their firearms control laws," and "help combat . . . the

incidence of serious crime."  *See* 18 U.S.C. § 921 *et seq.*; S. Rep. No. 89-1866, at 1

(1966).  The GCA supplanted some prior firearms regulations, but exists alongside the

NFA.  *See* An Act to Regulate Commerce in Firearms, Pub. L. No. 785, 52 Stat. 1250

(1938) (repealed 1968).  The GCA followed on the heels of other federal legislation that

stressed Congress's findings of an extensive interstate commerce in firearms and a need

for adequate federal control over such traffic. *See* Omnibus Crime Control & Safe Streets

---

Cir. 2002); *F.J. Vollmer Co., Inc. v. Higgins*, 23 F.3d 448, 449 (D.C. Cir. 1994).
"Firearms" includes machine guns, short-barreled shotguns, short-barreled rifles, and
several items that would not ordinarily be considered "firearms," such as silencers,
rockets, and grenades.  Thus, as a general matter, standard-length shotguns and rifles
(including all semi-automatic rifles) and non-automatic handguns, are not "firearms"
within the NFA's definition.

[3] Congress passed the NFA pursuant to its taxation powers, and the NFA is codified in
the Internal Revenue Code.  Chapter 53 specifies that each maker of a regulated firearm
"shall, prior to . . . making [it] . . . obtain authorization," 26 U.S.C. § 5841(c), including
by: (1) fil[ing] "a written application . . . to make and register the firearm"; (2) paying
"any tax payable"; and (3) receiving approval from ATF.  26 U.S.C. § 5822.

3

Act, Pub. L. No. 90-351, 82 Stat. 197 (1968).

Less than two decades later came the FOPA, an omnibus statute intended to protect the rights of law-abiding firearms owners as well as to strengthen federal law "to enhance the ability of law enforcement to fight violent crime." H.R. Rep. No. 99-495, at 1, (1986), *reprinted in* 1986 U.S.C.C.A.N. 1327, 1327. Congress froze the privately-held inventory of machine guns as part of the FOPA in light of "the need for more effective protection of law enforcement officers from [continued] proliferation of machine guns" and the use of such weapons "by racketeers and drug traffickers." *See* H.R. Rep. No. 99-495, at 4, 7.[4] This portion of the FOPA has been codified at 18 U.S.C. § 922(o)(1), which makes it "unlawful for any person to transfer or possess a machinegun," subject to the following exceptions:

> (A) a transfer to or by, or possession by or under the authority of, the United States or any department or agency thereof or a State, or a department, agency, or political subdivision thereof; or
>
> (B) any lawful transfer or lawful possession of a machinegun that was lawfully possessed before the date this subsection takes effect.

18 U.S.C. § 922(o)(2). The FOPA and GCA define the term "machinegun" by incorporating the NFA's definition of the term. *See* 18 U.S.C. § 921(a)(23). As amended

---

[4] The legislative history of the specific amendment that added § 922(o) is limited. Because "§ 922(o) is closely intertwined with other federal gun legislation," however, the Courts of Appeals "have referred to legislative history not only of § 922(o) itself, but also of other federal gun legislation generally," finding that Congress need not "rearticulate its old findings every time it adds an additional provision." *United States v. Haney*, 264 F.3d 1161, 1169 n.3 (10th Cir. 2001) (citation omitted); *see generally* David T. Hardy*, The Firearms Owners' Protection Act: A Historical and Legal Perspective*, 17 Cumb. L. Rev. 585, 589-605 (1987).

by the GCA and the FOPA, the NFA defines a "machinegun" as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b); *Higgins*, 23 F.3d at 449.

Congress and the Attorney General have conferred on ATF the responsibility for investigating and enforcing criminal and regulatory violations of Federal firearms law as well as the authority to promulgate regulations necessary to enforce the provisions of the GCA and NFA. *See* 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a); 28 U.S.C. § 599A(b)(1); 28 C.F.R. § 0.130(a)(1)-(2).  The Final Rule is an exercise of this authority over the GCA's prohibition on machine guns and over the definition of these weapons derived from the NFA.

### B. Some Bump Stocks Have Previously Been Treated As Prohibited Machine Guns, While Others Have Been Treated As Unregulated Firearms Parts.

As part of its regulation of firearms, ATF permits manufacturers and owners to request the agency's view regarding the correct classification of a firearm, accessory, or other item, and in response, the agency may provide a classification letter indicating its current position on a particular device.  *See* ATF, National Firearms Act Handbook § 7.2.4 (2009).  Nothing in federal law requires a firearms manufacturer or owner to seek such a classification letter, however, and such classifications are subject to change.  *Id.*;

*see Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 599-600 (1st Cir. 2016).

In 2002 and 2004, a Florida entrepreneur named William Akins asked ATF to determine whether an eponymous model of a bump stock, the Akins Accelerator, would be classified as a machine gun under the NFA. *Akins v. United States*, 312 F. App'x 197, 198 (11th Cir. 2009) (per curiam). ATF tested a prototype of the device and concluded it did not constitute a machine gun. *Id.* After receiving further requests to assess similar devices, ATF reversed its view, focusing on the fact that the Akins Accelerator "use[d] an internal spring" along with "the force of recoil to reposition and refire the rifle." *Id.* ATF therefore reclassified the device as a machine gun and ordered the inventor "to register the devices he possessed or to surrender them." *Id.* at 199. Mr. Akins sued, and ATF successfully defended its classification determination in district court and in the Eleventh Circuit Court of Appeals. *Id*. at 198. In a separate action, Mr. Akins requested compensation for the purported taking of his property; however, the Court of Federal Claims concluded that the determination did not give rise to a compensable taking. *See Akins v. United States*, 82 Fed. Cl. 619 (2008).

ATF subsequently received classification requests for other devices that, unlike the Akins Accelerator, did not include internal springs. In a series of classification decisions between 2008 and 2017, ATF applied a policy statement issued at the time it reclassified the Akins Accelerator, and concluded that such devices were not machine guns because they lacked a spring. Final Rule at 66517; *see* ATF Ruling 2006-2. These classification letters treated bump stocks as unregulated firearms accessories. Because bump stocks then became popular with certain categories of firearms owners, DOJ has

6

estimated that manufacturers sold at least 520,000 bump stocks at an estimated average price of approximately $300.  *See* Final Rule at 66538.

### C.    The Final Rule Clarified That Bump Stocks Fall Within The Statutory Definition of Machine Gun.

In the wake of the use of bump stocks in an October, 2017 attack on a concert in Las Vegas, renewed public attention on the classification of these devices led DOJ to revisit its prior analysis of the terms used to define machine gun in 26 U.S.C. 5845(b), along with whether bump stocks properly should be classified as machine guns.  *See* Final Rule at 66516-17.  As an initial step, DOJ published an advance notice of proposed rulemaking ("ANPRM").  *See Application of the Definition of Machinegun to "Bump Fire" Stocks and Other Similar Devices*, 82 Fed. Reg. 60929 (Dec. 26, 2017).  This ANPRM yielded over 35,000 comments.  *See* https://go.usa.gov/xV4j2.

On February 20, 2018, the President issued a memorandum to then-Attorney General Jefferson B. Sessions III concerning bump stocks.  *See Definition of Machinegun*, 83 Fed. Reg. 7949 (Feb. 20, 2018).  The memorandum instructed DOJ, working within established legal protocols, "to dedicate all available resources to complete the review of the comments received [in response to the ANPRM], and, as expeditiously as possible, to propose for notice and comment a rule banning all devices that turn legal weapons into machineguns."  *Id*.  Carrying out that directive, on March 29, 2018, DOJ published an NPRM, proposing to clarify the interpretations of the terms "single function of the trigger" and "automatically" in the statutory definition of "machinegun" in a manner consistent with the classification of bump stocks as machine

7

guns.  *See Bump-Stock-Type Devices*, 83 Fed. Reg. 13442 (Mar. 29, 2018).

Between the publication of the NPRM and the closing date for comments, June 27, 2018, DOJ received over 186,000 comments on the NPRM, spanning a wide range of views on issues raised by the proposed rule, including comments regarding whether implementation of the proposed rule would violate the Takings Clause.  *See* Final Rule at 66519, 66523.  DOJ then drafted the Final Rule, addressing the comments raised, including comments related to the Takings Clause.  *Id.* at 66523; *see generally* Final Rule at 66519-43.  The Final Rule was published in the Federal Register on December 26, 2018.  *See id.* at 66514.

In the Final Rule, DOJ clarified for members of the public that bump stocks are machine guns and overruled the prior, erroneous classification decisions treating bump stocks as unregulated firearms parts.  *See* Final Rule at 66516, 66531 (explaining that "the previous classification[s] . . . relied on the mistaken premise that . . . such devices do not enable 'automatic' firing") (citation omitted).  DOJ also instructed "current possessors" of bump stocks "to undertake destruction of the devices" or to "abandon [them] at the nearest ATF office."  *Id.* at 66549.  The Final Rule explained that DOJ would not take enforcement action for 90 days, to give possessors of bump stocks time to destroy the devices or to abandon them at the nearest ATF office.  *Id.* at 66530, 66549.[5]

### D.      Other Litigation Arising From The Federal Ban On Bump Stocks.

During the 90-day period before enforcement of the bump stock ban, an array of

---

[5] This 90 day period began upon publication in the Federal Register on Dec. 26, 2018.

plaintiffs challenged the Final Rule in venues around the country, seeking to enjoin the regulation from taking effect. *See, e.g., Guedes et al. v. ATF*, 356 F. Supp. 3d 109 (D.D.C. 2019), *aff'd* 920 F.3d 1 (D.C. Cir. 2019) (per curiam); *Gun Owners of America, Inc., et al. v. Barr, et al*., 363 F. Supp. 3d 823 (W.D. Mich. 2019), *on appeal,* No. 19-1298 (6th Cir.).  These plaintiffs raised numerous legal challenges to the Final Rule, primarily under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq*.  Courts uniformly denied preliminary injunctive relief upon determining that the plaintiffs failed to demonstrate a likelihood of success on the merits.  *See Guedes*, 920 F.3d at 1; *Gun Owners of America, Inc. et al. v. Barr, et al.,* No. 19-1298, 2019 WL 1395502 at *1 (6th Cir. Mar. 25, 2019); *Aposhian v. Barr*, 374 F. Supp. 3d 1145 (D. Utah 2019).  Appeals continue in these cases.  *See, e.g.*, *Aposhian v. Barr, et al.* No. 19-4036 (10th Cir.); *Gun Owners of America*, 2019 WL 1395502.

Only one of the judicial opinions at the preliminary-relief stage addressed a takings claim.  In *Codrea et al., v. Barr, et al.*, No. 18-cv-3086 (D.D.C.) (consolidated with *Guedes, et al. v. ATF et al.*, No. 18-cv-2988 (D.D.C.)), plaintiffs asserted that the Final Rule should be invalidated due to the lack of compensation for lawful owners of bump stocks.  *See Guedes*, 356 F. Supp. 3d at 137.  The district court declined to assess the likelihood of success on the claim, instead observing that "equitable relief is not available to enjoin an alleged taking of private property for a public use . . . when a suit for compensation can be brought" later.  *Id.* (citation omitted); *see also Ruckelshaus v. Monsanto*, 467 U.S. 986, 1016 (1984); *Building Owners & Managers Ass'n v. FCC*, 254 F.3d 89, 101 (D.C. Cir. 2001) (Randolph, J., concurring) ("There is no constitutional

9

necessity for payment [in a takings case] to be made in advance, at least so long as the government provides a way for the property owner to recover just compensation after the taking is completed.").  Because plaintiffs had "made no showing that a suit for compensation under the Tucker Act, or the Little Tucker Act" would be inadequate, the district court concluded that "[p]reliminary injunctive relief [was] therefore unavailable." *Guedes*, 356 F. Supp. 3d at 137 (citations omitted).  The plaintiffs did not pursue an appeal of the denial of preliminary injunctive relief on this claim.

In addition, three actions have been brought in the Court of Federal Claims seeking to recover "just compensation" for bump stocks destroyed or abandoned pursuant to the Final Rule, and motions to dismiss are pending in all three cases.  *See Rouse, et al. v. United States*, 18-cv-1980 (Fed. Cl.); *Modern Sportsman, LLC, et al. v. United States*, 19-cv-449 (Fed. Cl.); *McCutchen, et al. v. United States*, 18-cv-1965 (Fed. Cl.).  In each of these lawsuits, Plaintiffs contend that the Final Rule effects an unconstitutional taking without just compensation, in violation of the Fifth Amendment, and in two, Plaintiffs are represented by the Flint Law Firm.  In *McCutchen*, Plaintiffs pleaded their claims on behalf of a class of "All United States persons who have purchased a bump-fire stock or bumpfire type device, as listed in [an exhibit to the Complaint], for personal or commercial use, during the period extending from June 7, 2010, through and to the filing date of this Complaint."   No motion for class certification has yet been filed in *McCutchen*, or in *Rouse*, also brought as a purported class action.

### E.    The Instant Action.

On June 24, 2019, Plaintiff filed the "Class Action Complaint" in this case.  *See*

Compl.  Plaintiff alleges that he resides in Ellis County, Texas, and that he "legally

purchased and owned multiple" bump stocks, including at least "three slide-fire bump-

stocks" in which he had a property interest "[a]t the time of issuance of the [Final] Rule."

*See id.* ¶ 6.  He contends that "bump-stocks were fully legal in the United States when

[he] paid money to purchase his," like "hundreds of thousands of other citizens."  *Id.*

¶ 21.  He further contends that the Final Rule "did not just take *value* from [his] property

. . . it actually *physically* took the tangible property itself."  *Id.* ¶ 33.  Pursuant to these

allegations, he seeks to represent a "class of similarly situated purchasers of bump-stock

devices," and intends to seek certification of this class as "[a]ll individuals or entities of

the United States who purchased fewer than 15 bump-stock devices or bump-fire devices,

lawfully possessed them and then destroyed them as required by the Final Rule."  *Id.* ¶¶

37-38.  Plaintiff suggests that "there are in excess of 100,000 Class members."  *Id.* ¶ 40.

### III.    Arguments And Authorities in Support

#### A.    Legal Standard For A Motion To Dismiss Under Rule 12(b)(6).

Federal Rule of Civil Procedure 12(b)(6) provides Defendants the opportunity to

move to dismiss for failure to state a claim upon which relief can be granted.  *See* Fed. R.

Civ. P. 12(b)(6).  Dismissal must be granted unless "a complaint . . . contain[s] sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted) (internal quotation marks

omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged."  *Id.*; *see also New York Pizzeria, Inc. v. Syal*, 56 F. Supp. 3d 875,

878 (S.D. Tex. 2014) (Costa, J.).  In reviewing a Rule 12(b)(6) motion, "the court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig*., 495 F.3d 191, 205 (5th Cir. 2007) (cleaned up).

### B.     The Prohibition On Bump Stock Possession Is An Exercise Of The Police Power That Does Not Give Rise To A Compensable Taking.

The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation."  U.S. Const. amend. V. Although the plain language of the Clause "requires the payment of compensation whenever the government acquires private property for a public purpose," *Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 321 (2002), "[i]t is clear that not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense."  *Price v. City of Junction, Tex.*, 711 F.2d 582, 591 (5th Cir. 1983) (citation omitted); *see also Murr v. Wisconsin*, 137 S. Ct. 1933 (2017); *Illinois Bell Telephone Co. v. FCC*, 988 F.2d 1254 (D.C. Cir. 1993).  These cases recognize long-established precedent holding that the scope of the Takings Clause excludes "[a] prohibition simply upon the use of property for purposes that are declared . . . to be injurious to the health, morals, or safety of the community[.  Such] cannot, in any just sense, be deemed a taking."  *Mugler v. Kansas*, 123 U.S. 623, 668 (1887); *see Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1027 (1992) ("[T]he property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers.").  This is particularly true "in the case of personal property, by reason of

the State's traditionally high degree of control over commercial dealings," which creates "the possibility that new regulation might even render . . . property economically worthless (at least if the property's only economically productive use is sale or manufacture for sale)." *Lucas,* 505 U.S. at 1027-28 (citing *Andrus v. Allard*, 444 U.S. 51, 66–67 (1979).  Accordingly, such exercises "of the police power . . .  [are] treated as legitimate even in the absence of compensation to the owners of the . . . property." *Acadia*, 458 F.3d at 1332-33.[6]

There can be no doubt that DOJ's promulgation of the Final Rule to clarify that bump stocks are machine guns is an exercise of the police power in support of public health and safety that thereby does not require compensation under *Mugler*.  "[T]he lawful exercise of the police power" includes prohibitions on "private property . . . as contraband goods, a power, the exercise of which is essential to the preservation of order and the enforcement of the laws."  *German Alliance Ins. Co. v. Barnes*, 189 F. 769, 775 (Kan. 1st Cir. 1911); *see Acadia*, 458 F.3d at 1332 ("[T]he . . .  exercise of the police power to condemn contraband or noxious goods . . . has not been regarded as a taking for public use.")[7]; *cf. Spell v. Edwards*, No. 12-cv-796, 2013 WL 5232341 at *1 (E.D. La.

---

[6] In a seminal description of the police power, the Massachusetts Supreme Judicial Court explained that, as distinct from the power of eminent domain, "the police power [is] the power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the [public] good and welfare."  *Commonwealth v. Alger*, 61 Mass. 53, 85 (1851).

[7] "[O]bjects the possession of which, without more, constitutes a crime" are "described as contraband per se."  *One 1958 Plymouth Sedan v. Penn.*, 380 U.S. 693, 699 (1965).

Sept. 13, 2013) (a party "does not have a Fifth Amendment takings claim" when "the product seized was contraband at the time it was seized").  Congress has declared machine guns to be contraband by adopting the ban in 18 U.S.C. § 922(o), which forbids new machine gun registrations.  *See United States v. Gilbert*, No. CR05-71 MJP, 2016 WL 11588376 (W.D. Wash. Feb. 26, 2016) ("no person . . . may lawfully possess . . . unregistered machineguns . . . because they are contraband under 26 U.S.C. § 5861(d)"); *accord Hamilton*, 57 F. App'x 211 (recognizing machine guns as contraband).  "By clarifying that bump-stock-type devices are [contraband] machineguns," Final Rule at 66537, the Final Rule "protect[s] the public" from such weapons and is therefore a legitimate exercise of the police power for which Plaintiff "has no claim under the Fifth Amendment."  *Osamor v. United States*, No. 4:09-cv-1500, 2010 WL 11668149 at *9 (S.D. Tex. Nov. 5, 2010); *see also Murr*, 137 S. Ct. at 1943 (recognizing "the government's well-established power to 'adjust rights for the public good' . . . 'without paying for every such change'" in value to property thereby caused) (quoting *Andrus,* 444 U.S. at 65 and *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922)).

Applying this principle, federal courts have recognized that several earlier prohibitions on bump stocks—at both the state and federal level—did not give rise to a compensable taking.  In *Akins*, after unsuccessfully challenging ATF's decision to reverse its classification, the inventor sought compensation in the Court of Federal Claims.  Notwithstanding his reliance on an ATF letter explicitly stating that the device "does not constitute a machinegun," that court analogized ATF's reversal to the "condemn[ation] of contraband" in *Acadia* and explained that "[p]roperty seized and

retained pursuant to the police power is not taken for a 'public use' in the context of the Takings Clause." *Akins*, 82 Fed. Cl. at 622.  Observing further that the plaintiff was fully aware of the "potential for federal regulation of his invention" given the long, restrictive regulation of machine guns, the Court added that Plaintiff's "expectation interest" was thus "not a property interest protected by the Fifth Amendment." *Id.* at 624.

Likewise, federal district courts have rejected takings claims brought in connection with recent state laws criminalizing possession of bump stocks in the wake of the Las Vegas attack.  *See Maryland Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 408-10 (D. Md. 2018); *Roberts v. Bondi*, No. 8:18-cv-1062, 2018 WL 3997979 at *3-4 (M.D. Fla. Aug. 21, 2018).  In *Hogan*, plaintiffs challenged a Maryland statute banning, *inter alia*, the possession or sale of bump stocks, contending that the statute unlawfully seized property without just compensation.  353 F. Supp. 3d at 405, 407.  The Maryland district court disagreed, concluding that the bump stock ban constituted a "prohibition[] of hazardous contraband," and thereby constituted "a legitimate exercise of the state's traditional police power to regulate for public safety."  *Id.* at 408-09.  For that reason, the court determined that the Maryland statute fell within the types of property regulations that "cannot, in any just sense, be deemed a taking."  *Id.* at 409 (quoting *Mugler*, 123 U.S. at 668).  In *Roberts*, a plaintiff challenged Florida's similar ban on bump stocks. *See Bondi*, 2018 WL 3997979 at *1.  Although declining to dismiss plaintiff's Second Amendment claim, the Florida district court summarily rejected claims for compensation, reasoning that the state statute "prohibits the possession of contraband" and therefore "is not a compensable taking" under the Fifth Amendment.  *Id.* at *3-4.

15

Like the bump-stock bans at issue in *Akins*, *Hogan*, and *Roberts*, the federal

criminal prohibition of bump stocks is the imposition of criminal sanctions against those

who would hold dangerous items, in a circumstance when the Government ordered the

destruction of such contraband rather than seizing it for public use.  Similar laws have

long been treated as archetypal exercises of the power to protect the public safety that are

beyond the compensation requirement.  For example, in *Mugler*, the Supreme Court held

that a state law outlawing manufacture and sale of alcoholic beverages did not constitute

a taking of private property for public use because it involved the use of "the police

powers of the state, exerted for the protection of the health, morals, and safety of the

people."  123 U.S. at 668-69.  Likewise, in *Miller v. Schoene*, the Supreme Court found

no flaw in a statute that, in the interests of agricultural health, required landowners "to cut

down a large number of ornamental red cedar trees growing on their property . . . [to]

prevent[] the communication of a rust or plant disease . . . to the apple orchards in the

vicinity," despite the lack of compensation.  276 U.S. 272, 277 (1928).  This principle

retains its vitality in the present day.  Thus, in *Holliday Amusement Co. of Charleston,*

*Inc. v. South Carolina*, the Fourth Circuit rejected a compensation claim where a state

"compel[led] the forfeiture of video gaming machines" as part of "outlaw[ing] the

possession" of such items.  493 F.3d 404, 406, 410 (4th Cir. 2007).  In doing so, the

Fourth Circuit recognized that deviating from this principle could cause "the most basic

exercises of the police power [to] become the subject of ever more expense and

litigation."  *Id.* at 410; *see also AmeriSource Corp. v. United States*, 525 F.3d 1149, 1150

(Fed. Cir. 2008) (permitting federal government to "seize[] . . . third party[] property for

use in a criminal prosecution," even if it is thereby "rendered worthless"). The ban on bump stocks is no different: no compensable taking has occurred.[8]

To be sure, courts in the Fifth Circuit have allowed some claims for compensation to proceed against exercises of the police power, reasoning that "[t]he Supreme Court's entire 'regulatory takings' law is premised on the notion that a city's exercise of its police powers can go too far, and if it does, there has been a taking." *John Corp. v. City of Houston*, 214 F.3d 573, 578 (5th Cir. 2000) (finding that the denial of renovation permits leading to the loss of value in apartment buildings could give rise to a takings claim against the exercise of police power) (citing *Mahon*, 260 U.S. at 415) ("if regulation goes too far it will be recognized as a taking"); *accord Archbold-Garrett v. New Orleans City*, 893 F.3d 318, 324-25 (5th Cir. 2018) (reversing dismissal of claims challenging demolition of a townhouse on plaintiffs' property).[9] Unlike the proscription of bump

---

[8] Significantly, the exercise of the police power creates no compensable taking even absent a criminal prohibition or imminent danger to human life. For instance, in *Miller*, the Supreme Court permitted the "preferment of [the public] interest [in preventing the spread of an agricultural disease] over the property interest of the individual, to the extent even of its destruction," finding this to be "the distinguishing characteristic[] of every exercise of the police power which affects property." 276 U.S. at 280. Similarly, in *Acadia*, the Federal Circuit held that a "[c]ustoms seizure of goods suspected of bearing counterfeit marks" was not a compensable taking, and treated it instead as "a classic example of the … exercise of the police power to condemn contraband or noxious goods." 458 F.3d at 1332 (the use of such authority should not be "regarded as a taking for public use for which compensation must be paid"). And in *Allied-Gen. Nuclear Svcs. v. U.S.*, 839 F.2d 1572 (Fed Cir. 1988), the court rejected a compensation requirement where the government "refused to issue the expected operating permit" for a plutonium recycling plant even after "actively promot[ing] and induc[ing] the . . . expenditure of over $200 million." *Mitchell Arms v. U.S.*, 7 F.3d 212, 217 (Fed. Cir. 1993).

[9] *See also Residents Against Flooding v. Reinvestment Zone No. 17, Houston, Tex.*, 260 F. Supp. 3d 738, 765, 804 (S.D. Tex. 2017) (takings claim for deliberate flooding of

stocks, however, none of the challenged exercises of the police power to which courts have applied this theory involved the classification of an item as contraband, one of "the most basic exercises of the police power." *Holliday Amusement*, 493 F.3d at 410. *John Corp*. and its progeny therefore fall comfortably within an established principle: that rote invocation of the phrase "police power" is "insufficient to avoid the burdens imposed by the Takings Clause." *Acadia*, 458 F.3d at 1332. Such a circumstance is far different from bans on contraband, unquestionably at the core of the police power, where a compensation requirement "would entail a radical curtailment" of such power. *Hogan*, 353 F. Supp. 3d at 408-10.

###### C. The Ban on Bump Stocks Does Not Constitute A *Per Se* Taking For Which Compensation Is Required Under *Horne v. Dep't of Agriculture*.

The Complaint contends that the ban on bump stocks works "a physical dispossession of personal property by the Government" that "must be compensated" under *Horne v. U.S. Dep't of Agriculture.* Compl. ¶ 34; *see also Horne*, 135 S. Ct. 2419 (2015). *Horne* has no application here—nothing has been taken.

Although *Horne* held that the Government has a "categorical duty under the Fifth Amendment to pay just compensation," and that this duty applies not "only to real property, [but] to personal property," *Horne*, 135 S. Ct. 2425-26, the mere fact that bump

---

residential property held to be unripe, but not barred by police power doctrine); *Queta's Investment, Inc. v. City of Hidalgo*, No. M-04-272, 2005 WL 2416656 (S.D. Tex. Sept. 30, 2005) (rejecting argument that police power precluded consideration of takings claim for application of a municipal landscaping ordinance); *Jim Sowell Const. Co. v. City of Coppell, Tex.*, No. 3:96-CV-0666-D 2000 WL 968782 (N.D. Tex. July 12, 2000) (rejecting argument that a takings claim could not proceed to the merits because zoning decisions involved the exercise of the police power).

stocks are personal property is insufficient to bring the challenged rule within the ambit

of *Horne*.  As an initial matter, *Horne* did not address the "police power" limitation on

compensable takings at all, and no consequential inference may be drawn from its

silence.  *See United States v. Hager*, 879 F.3d 550, 555 (5th Cir. 2018) ("[A]bsent clear

indications from the Supreme Court itself, lower courts should not lightly assume that a

prior decision has been overruled *sub silentio.*") (quoting *Wilkerson v. Whitley*, 28 F.3d

498, 504 (5th Cir. 1994)).  Further, there is no physical seizure involved in the bump

stock ban, whereas *Horne*'s analysis turned on the fact that the Department of

Agriculture's seizures of raisins in *Horne* involved an "actual taking of possession . . . for

the Government's control and use."[10]  *Horne*, 135 S. Ct. at 2428.  As the Court explained,

this distinction is critical in light of the original public meaning of the Takings Clause:

"[T]he author of the first treatise on the Constitution . . . [stated] the Takings Clause was

'probably' adopted in response to 'the arbitrary and oppressive mode of obtaining

supplies for the army, and other public uses, by impressment.'"[11]  *Horne*, 135 S. Ct. at

---

[10] As the Court explained, after seizing the raisins as part of the program challenged in
*Horne*, the Government "sells them in noncompetitive markets, for example to exporters,
federal agencies, or foreign governments; donates them to charitable causes; releases
them to growers who agree to reduce their raisin production; or disposes of them by any
other means."  (internal quotation marks omitted).  *Horne*, 133 S. Ct. at 2424.

[11] *Horne* also enumerated Founding era examples where compensation issued for takings
of personal property, all of which involved appropriations for government use.  *See, e.g.*,
*Horne*, 133 S. Ct. 2436 ("Virginia allowed the seizure of surplus 'live stock, or beef,
pork, or bacon' for the military." (quoting 1777 Va. Acts ch. XII)) ("South Carolina
authorized the seizure of 'necessaries' for public use." (quoting 1779 S.C. Acts § 4);
*compare, e.g.*, *Gardner v. Michigan*, 26 S. Ct. 106 (1905) (no requirement of
compensation for surrender of garbage to city contractor for disposal and destruction)
*with Nortz v. United States*, 294 U.S. 317 (1935) (only amount of compensation, not

2426 (quoting St. George Tucker in 1 Blackstone's Commentaries, Editor's App. 305–306 (1803)).  The ban on bump stocks involves no comparable "impressment" or "appropriation" for public use; instead, the Final Rule "encouraged destruction" as the preferred option for disposal of bump stocks and stated that, if delivered to the Government, ATF "will . . . destroy [the] devices in-house." Final Rule at 66551.

Finally, *Horne* is distinguishable because it involved the government taking private property for its own use, a scenario not present here.  Specifically, in *Horne*, the Supreme Court required that compensation be paid for raisins "transferred from [raisin] growers to the Government."  135 S. Ct. at 2428.  Despite Plaintiff's insistence that the bump stock ban "actually *physically* took the tangible property itself," Compl. ¶ 33 (emphasis in original), the Government's "encouraged" approach for bump stock owners to comply with 18 U.S.C. § 922(o) was "to undertake the destruction of the devices" rather than transfer them to the Government.  To that end, the Final Rule provides instructions about how to destroy a bump stock:

> methods of destruction include completely melting, shredding, or crushing the device. If the device is made of metal, an alternative acceptable method of destruction is using an oxy/acetylene torch to make three angled cuts that completely severs design features critical to the functionality of the bump-stock-type device. Each cut should remove at least 1⁄4 inch of metal per cut. Any method of destruction must render the device so that it is not readily restorable to a firing condition or is otherwise reduced to scrap. However, as the majority of bump-stock-type devices are made of plastic material, individuals may use a hammer to break them apart so that the device is not readily restorable to a firing condition or is otherwise reduced to scrap, and throw the pieces away.

---

requirement of compensation, at issue where Secretary of Treasury required surrender of gold for government use thereof).

Final Rule at 66530.  The Final Rule also informed bump stock owners that "[a]dditional information on the destruction" of bump stocks would be made available online, and ATF proceeded to publish such information.  *See Bump Stock Destruction Instructions*, ATF, https://www.atf.gov/rules-and-regulations/docs/undefined/bump-fire-stocks-and-devices-destruction-diagrams/download (last visited Aug. 29, 2019).  Only as a last alternative were bump stock owners provided an opportunity "to abandon bump-stock-type devices at the nearest ATF office," but those devices were also to be "destroy[ed] . . . in-house" by ATF, not retained for government use.  Final Rule at 66530.[12]  Because the Final Rule did not require that the "articles [be] seized" or impose a "physical appropriation" of the devices, *Horne* does not apply.  *Id.*, 135 S. Ct. at 2425-26.

### D. Under The Regulatory Takings Principles Supplied By *Penn Central*, No Compensable Regulatory Taking Has Occurred.

Plaintiff's claims are equally subject to dismissal should the Court determine that the claims are appropriately analyzed under the framework of *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978).[13]  "Prior to Justice

---

[12] Defendants acknowledge that, to accommodate requests made in connection with litigation over the validity of the bump stock rule, ATF has agreed to store, rather than immediately dispose of, some of the bump stocks surrendered to the agency.  *See, e.g.*, *Cargill v. Barr*, Case No. 19-cv-349 (W.D. Tex.).

[13] Plaintiff's pleading choices cast significant doubt on whether Plaintiff has raised a regulatory takings claim under *Penn Central*.  Plaintiff states that the Final Rule did not "take *value* from Plaintiffs' property by overregulating it; it actually *physically* took the tangible property itself.  Put even more succinctly . . . it was physically taken from him."  Compl. ¶ 33 (emphasis in original) (characterizing effect of Final Rule as "a physical dispossession"); Compl. at Prayer for Relief ¶ B (seeking a declaration "that the Government's action . . . constituted a physical taking").  However, given that Plaintiff seeks to certify a class that includes bump stock owners who themselves "destroyed them

21

Holmes's exposition in [*Mahon*], it was generally thought that the Takings Clause reached only a direct appropriation of property, or the functional equivalent." *Lucas*, 505 U.S. at 1014 (cleaned up). *Mahon* held that "compensation was also required for a 'regulatory taking'—a restriction on the use of property that went 'too far.'" *Horne*, 135 S. Ct. at 2427 (citing *Mahon*, 260 U.S. at 415). *Penn Central*, in turn, "clarified that the test for how far was 'too far'" required an 'ad hoc' factual inquiry." *Id.* (citing *Penn Central*, 438 U.S. at 124).

"The *Penn Central* Court acknowledged that it had been 'unable to develop any set formula' for evaluating regulatory takings claims, but it did identify 'several factors that have particular significance.'" *Degan v. Bd. of Trustees of Dallas Police & Fire Pension Sys.*, No. 17-cv-01596-N, 2018 WL 4026373 at *7 (N.D. Tex. Mar. 14, 2018) (quoting *Lingle v. Chevron, U.S.A.*, 544 U.S. 528, 538 (2005)) (cleaned up); *see also Da Vinci Inv., L.P. v. City of Arlington, Tex.*, 747 F. App'x 223, 228 (5th Cir. 2018).  "*Penn Central* focused on three factors: (1) 'the economic impact of the regulation on the claimant,' (2) 'the extent to which the regulation has interfered with distinct investment-backed expectations,' and (3) 'the character of the governmental action—for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good.'" *Degan*, 2018 WL 4026373 at *7 (quoting *Lingle*, 544 U.S. at 538-39).  Even if *Penn Central* applied to the current case, a regulatory claim under

---

as required," Compl. ¶ 38, Defendants provide this analysis of Plaintiff's claim as a regulatory taking in the event the Court deems such analysis appropriate.

*Penn Central* would necessarily fail for the same reasons Defendants have explained indicate that no compensable taking has occurred at all.  *See supra* Part III.B.

Reaffirming that "the nature of the State's interest . . . is a critical factor" in analyzing the "public purpose" and character of the governmental action under *Penn Central*, the Supreme Court has explained that an action taken "to arrest what [the Government] perceives to be a significant threat to the common welfare" is a factor that "leans heavily against finding a taking."  *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485-489 (1987).  The statutory prohibition on machine guns is part of the effort to fight violent crime and protect law enforcement officers.  *See supra* Part I.A; *compare* Final Rule at 66520.  The ban on bump stocks as machine guns, in turn, comes directly from Congress's mandate that dangerous, automatic weapons like those used in Las Vegas should not be unregulated.  *See* Final Rule at 66516.  This factor alone weighs strongly against finding a taking under the *Penn Central* analysis.  *See Gun South, Inc. v. Brady*, 877 F.2d 858, 869 (11th Cir. 1989) (evaluating a restriction on firearms imports and finding "the character of the governmental action . . . [to be] in a purely regulatory capacity" where the Government "does not profit from its actions").

It is likewise the case that Plaintiff had no reasonable investment-backed expectation that bump stocks would go unregulated.  The firearms industry is highly regulated, especially with regard to contraband weapons like machine guns; as such, Plaintiff is mistaken to claim to have had "legitimate investment-backed expectations" in his bump stocks "as firearms parts."  Compl. ¶ 21; *see Mitchell Arms, Inc. v. U.S.*, 7 F.3d 212, 216 (Fed. Cir. 1993) ("enforceable rights sufficient to support a taking claim against

the United States cannot arise in an area voluntarily entered into and. . . subject to pervasive Government control," such as "the firearms import business"); *accord Branch v. United States*, 69 F.3d 1571, 1581 (Fed. Cir. 1995) (a party's "reasonable investment-backed expectations are greatly reduced in a highly regulated field").  In *Mitchell Arms*, acting in reliance on import permits issued by ATF (and subsequent assurances from ATF that the permits would be honored), a private business acquired approximately 9,000 rifles and shipped them to ports of entry, whereupon the Government refused to honor the import permits.  *See* 7 F.3d at 214.  The reviewing courts rejected plaintiff's claim for compensation, concluding that, because the "ability to import the rifles . . . was at all times entirely subject to the exercise of ATF's regulatory power," no proper investment-backed expectation "arose on Mitchell's part."  7 F.3d at 217.  The Fifth Circuit has indicated its agreement with these principles, holding that a party has no "substantial likelihood of establishing" that a regulatory taking has occurred where the Government's "authority to exercise control" arises in a "highly regulated environment."  *Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 272-74 (5th Cir. 2012) (recognizing the taxi industry in New Orleans as "heavily regulated" in light of the city's licensing system).

Plaintiff's only support for his claim of such "expectations" is that ATF "issued multiple classification decisions" to other parties who sought determinations from ATF, some of which stated that the bump stock submitted "is not regulated as a firearm" under federal law.  Compl. ¶¶ 18, 20.  But ATF has long made clear that, while such letters "may generally be relied upon by their recipients as the agency's official position concerning the status of the firearms," the "classifications are subject to change if later

24

determined to be erroneous or impacted by subsequent changes in the law or regulations." *See* ATF, National Firearms Handbook § 7.2.4 (2009).  Indeed, the very fact that parties saw it necessary to contact ATF for an opinion regarding whether bump stocks are prohibited machine guns underscores the "pervasive Government control" over this field that precludes the existence of reasonable expectations.  *See Akins*, 312 F. App'x 198.

In light of the strength with which *Penn Central*'s "character" and "expectations" factors point in the Government's favor, the "economic impact" factor should be accorded minimal weight.  As the Supreme Court explained in *Lucas*, an owner of personal property "ought to be aware of the possibility that new regulation might even render his property economically worthless."  505 U.S. at 1027-28.  Thus, even though the classification of bump stocks as prohibited machine guns has rendered Plaintiff's devices "economically worthless," the "economic impact" factor cannot offset the Government's actions to protect public safety by making clear that the longstanding prohibition on machine guns applies to bump stocks.

In short, even if the Court finds it necessary to examine the *Penn Central* factors, that analysis demonstrates that no compensable taking has occurred.

## IV.    Conclusion

For the foregoing reasons, the Court should dismiss Plaintiff's complaint.

Respectfully submitted,

Dated:  August 30, 2019                    ERIN NEALY COX
                                           United States Attorney

25

JOSEPH H. HUNT
Assistant Attorney General

JOHN R. TYLER
Assistant Branch Director

MATTHEW J. GLOVER
Counsel to the Assistant Attorney General

  /s/ *Eric J. Soskin*
ERIC J. SOSKIN (PA Bar #200663)
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Rm. 12002
1100 L Street, NW
Washington, D.C. 20530
Telephone: (202) 353-0533
Fax: (202) 616-8470
Email: Eric.Soskin@usdoj.gov

Brian W. Stoltz
Assistant United States Attorney
Texas Bar No. 24060668
1100 Commerce Street, Third Floor
Dallas, TX 75242-1699
Telephone: (214) 659-8626
Fax: (214) 659-8807
Email: brian.stoltz@usdoj.gov

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

On August 30, 2019, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2) or the local rules.

 /s/ Eric J. Soskin
Eric J. Soskin